

# IN THE
# Court of Appeals of Indiana

In re the Involuntary Termination of the Parent-Child Relationship of: Te.R., K.R., and Ko.W. (Minor Children), and T.R. (Father) and K.W. (Mother),

*Appellants-Respondents*

FILED

Jul 08 2026, 9:10 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

and

Kids' Voice of Indiana,

*Appellee-Guardian Ad Litem*

---

July 8, 2026

Court of Appeals Case No.
26A-JT-38

Appeal from the Marion Superior Court

The Honorable Melanie Kendrick, Judge

**Opinion by Judge Brown**
Judges Bailey and Weissmann concur.


**Brown, Judge.**

[1] T.R. ("Father") and K.W. ("Mother," and together with Father, "Parents") jointly appeal the involuntary termination of their parental rights to their minor children Ko.W, K.R., Te.R. (the "Children").[1] We affirm in part, reverse in part, and remand.

## Facts and Procedural History

[2] Mother is the biological mother of Ko.W., born in July 2014, K.R., born in September 2016, and Te.R., born in April 2018. Father is the biological father of K.R. and Te.R. In 2022, law enforcement responded to a report that Parents were involved in an episode of domestic violence that "involved the discharge of a firearm." Transcript Volume II at 10. On July 7, 2022, the Indiana Department of Child Services ("DCS") filed a petition alleging that the

---

[1] For ease and clarity in this consolidated appeal, we will generally refer to these minor children collectively as the Children. Mother challenges the termination order as to all three of the Children. However, Father is not the biological father of Ko.W., and thus he challenges only the trial court's termination order with respect to K.R. and Te.R. The father of Ko.W. does not participate in this appeal.

Children were children in need of services ("CHINS") due to domestic violence, Parents' history of substance abuse, and Parents' inability to "provide the [C]hildren with a safe and stable home." Exhibits Volume II at 59.[2] Following a hearing, at which Father failed to appear,[3] the trial court adjudicated the Children as CHINS but left them placed with Mother. At the time, Mother was living in an extended stay hotel. Within the first month, Mother decided she no longer wanted the Children in her custody and "dropped [the Children] off" at the DCS offices because she wanted them "to stabilize" and felt they would be "safer" in custody rather than "struggling" with her "in an extended stay hotel." Transcript Volume II at 7. As Mother was "unwilling to provide for [the Children's] basic needs and ha[d] abandoned them," the court ordered the Children removed from Mother's care. Exhibits Volume I at 74. The Children were placed together in foster care. On December 21, 2022, the court entered a dispositional decree ordering Mother into services.

[3] Father first appeared in the CHINS case on May 17, 2023, and began working with service providers in August 2023. The court entered a parental participation order on December 12, 2023. The court ordered Father to complete a domestic violence assessment and follow treatment

---

[2] The record indicates Parents had history with DCS dating back to July 2015.

[3] Father was initially served with notice of the CHINS proceedings by newspaper publication. As he failed to appear, he was found in default.

recommendations, engage in home-based therapy and follow all recommendations, participate in Father Engagement services and follow all recommendations, and meet his own medical and mental health needs including medication management and provide proof to DCS.

[4]     On June 26, 2024, the court held a review hearing. The court noted that the "case has been open for two years," the Children have been removed from Mother for two years, and "Mother is not making progress." Exhibits Volume I at 92. The court found that Father "made some progress, but then went to jail." *Id*. The court approved a concurrent plan of reunification and adoption.

[5]     On November 20, 2024, the court held a review hearing. DCS presented evidence that Mother was compliant with some services but her status as to other services was "uncertain." *Id*. at 97. DCS presented evidence that Mother had been aggressive and defiant with services providers. The evidence indicated that Father was participating in therapeutic supervised parenting time and Father's counsel noted that Father was engaging in "an intensive housing search but [had] not a lot of options due to his criminal history." *Id*. Mother addressed the court and accused DCS of "dropping the ball" and not helping her the way she wanted. *Id*.

[6]     The court held a review hearing on April 23, 2025. DCS presented evidence that Mother's home-based case management "closed in January for lack of contact" but that the service was "re-referred" when Mother asked to re-engage in early April 2025. *Id*. at 100-101. DCS noted that Mother was "fairly

compliant" with other services but she refused to participate in domestic violence services as ordered or random drug screens despite admitted regular marijuana use. *Id*. at 101. DCS presented evidence that Mother behaved inappropriately during supervised visitation with the Children and would not "accept redirection." *Id*. Mother became "animated" during the hearing regarding her frustrations with DCS, with the court ultimately "mut[ing]" her "as there ha[d] been enough profanity and personal attacks." *Id*. at 102.[4] As to Father, the evidence indicated that he was participating in services, was appropriate during visits with the Children, and had a connection with the Children. Father was living with his sister-in-law, looking for other housing, trying to obtain a driver's license, and trying to secure reliable transportation.

[7] On June 16, 2025, DCS filed verified petitions to terminate both Father's and Mother's parental rights. The court appointed Kids' Voice of Indiana as Guardian Ad Litem ("GAL"). The court held a factfinding hearing on November 4 and 18, 2025. On December 9, 2025, the court entered extensive findings of fact, conclusions thereon, and orders terminating the parent-child relationship between Parents and the Children.

---

[4] The record indicates that the review hearings were conducted via video.

## Discussion

Parents each challenge the termination of their parental rights. Regarding petitions seeking the termination of parental rights, Ind. Code § 31-35-2-4 provides in pertinent part that DCS must allege as follows:

> (c) A petition filed under subsection (a) must allege:
>
> > (1) the existence of one (1) or more of the circumstances described in subsection (d);
> >
> > (2) that there is a satisfactory plan for care and treatment of the child; and
> >
> > (3) that termination of the parent-child relationship is in the child's best interests.
>
> (d) A petition filed under subsection (a) must allege the existence of one (1) or more of the following circumstances:
>
> > \* \* \* \* \*
>
> > (2) That:
> >
> > > (A) the child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child; and
> > >
> > > (B) despite the department's reasonable efforts to preserve and reunify the child's family under IC 31-34-21-5.5, the parent has been unable to remedy the circumstances that resulted in the child being placed in care outside the parent's home.

> (3) That there is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

[9]     If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a). A finding in a proceeding to terminate parental rights must be based upon clear and convincing evidence. Ind. Code § 31-37-14-2. We do not reweigh the evidence or determine the credibility of witnesses but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014). We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. *Id.* We give due regard to the trial court's opportunity to judge the credibility of the witnesses firsthand. *Id.* "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id.* at 640. To the extent Parents do not challenge the court's findings of fact, the unchallenged facts stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied*.

A. *Mother*

We first address Mother's challenge to the trial court's conclusion that there is a reasonable probability that the conditions that resulted in the Children's removal or the reasons for placement outside her care will not be remedied.[5] In determining whether the conditions that resulted in the Children's removal will not be remedied, we engage in a two-step analysis. *See E.M*, 4 N.E.3d at 642-643. First, we identify the conditions that led to removal, and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id*. at 643. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions, balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id*. We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id*. Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of future behavior. *Id*. The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside

---

[5] To the extent Mother challenges the trial court's conclusions regarding additional subsections of Ind. Code § 31-35-2-4(d), we need not address those arguments as the involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed.

the home. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). A court may consider evidence of a parent's prior criminal history, drug abuse, history of neglect, failure to provide support, lack of adequate housing and employment, and the services offered by DCS and the parent's response to those services. *Id.*

[11] The record reveals that Children were removed from Mother's care due to domestic violence, substance abuse, and housing instability. Throughout the CHINS proceedings, Mother was inconsistent with services. While she did participate in and complete some services, she failed to complete a domestic violence treatment program as recommended, and her home-based therapy was closed due to noncompliance. Indeed, in the three years the case was pending, Mother had a history of disengagement from services, with numerous referrals closing unsuccessfully. Mother never progressed past supervised parenting time with the Children and, significantly, in the period leading up to termination, Mother failed to participate in supervised visitation with the Children and had not seen the Children in more than nine months at the time of the termination hearing.[6] Moreover, Mother exhibited emotional, aggressive, and unstable behaviors with the court, her Children, and service providers, and she failed to address her mental health despite orders that she do so. Although Mother

---

[6] Mother blames her noncompliance with services, including her demand that visitation with the Children cease in February 2025, on DCS and the service providers. However, the record reveals that Mother was often either passive and unengaged or hostile and antagonistic with providers. As for visitation specifically, Mother was not only inconsistent in attending visitation, she also had a history of behaving inappropriately toward the Children during supervised visits and her last visit with the Children ended in a heated exchange with the therapeutic visit facilitator after the facilitator tried to redirect Mother unsuccessfully.

suggests that the court erroneously relied on its findings of historical noncompliance with services rather than her current fitness, as observed above, the court has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. In light of the evidence set forth above and in the record, we cannot say the trial court clearly erred in finding that there is a reasonable probability that the conditions that resulted in the Children's removal or the reasons for placement outside Mother's care will not be remedied.[7]

[12] Mother also challenges the trial court's conclusion that termination of her parental rights is in the Children's best interests. In determining the best interests of children, the trial court is required to look to the totality of the evidence. *McBride v. Monroe Cnty. Off. of Fam. & Child.*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). The court must subordinate the interests of the parents to those of the children. *Id*. The court need not wait until children are irreversibly harmed before terminating the parent-child relationship. *Id*. The recommendation of a case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that

---

[7] To the extent that Mother challenges certain trial court findings as unsupported by the evidence, we conclude that each of those challenged findings is supported by sufficient evidence and/or the reasonable inferences to be drawn therefrom. To the extent Mother challenges certain trial court findings as "misleading" or "flawed," Appellant Mother's Brief at 32-33, those challenges amount to an improper request for this Court to reweigh the evidence and reassess witness credibility which we may not do.

termination is in the children's best interests. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158-1159 (Ind. Ct. App. 2013), *trans. denied*.

[13] Family Case Manager Robert Phillips ("FCM Phillips") opined that termination of Mother's parental rights and adoption by their current foster placement was in the Children's best interests. FCM Phillips explained that Mother had not "begun engaging in a lot of the services until recently," she "does not have stable housing," and she had not "appropriately treated her mental health." Transcript Volume II at 108-109. He further explained the importance of permanency and allowing the Children to "grow in an environment where they are able to have stability" and "where their basic needs are being met." *Id.* at 110. Similarly, Kids' Voice Guardian Ad Litem TeQuaysha Tubbs ("GAL Tubbs") opined that termination of Mother's parental rights and adoption was in the Children's best interests. She stated that she based her opinion on Mother's "patterns" of behavior and the Children's need for permanency and stability. *Id.* at 157. She testified that she had reviewed extensive documentation regarding the case, attended hearings, and worked with FCM Phillips, the Children's foster mother, and multiple services providers.

[14] Mother directs us to her counsel's cross-examination of GAL Tubbs during which she admitted "she had never spoken one-on-one with Mother and had never attended a Child and Family Team Meeting" with Mother. Appellant Mother's Brief at 29 (citing Transcript Volume II at 160). Mother suggests that a "GAL cannot possibly assess the totality of the evidence when she admits that

she has never spoken one-on-one with [Mother] and never even asked for her contact information." *Id*. Mother's arguments are a request for this Court to reweigh the evidence in her favor, a task not within our prerogative on appeal. As observed by Kids' Voice of Indiana, even assuming Mother is correct that GAL Tubbs's investigation was "flawed," the recommendation of the GAL is just "one piece of the best interests assessment that a trial court must make." Kids' Voice Appellee's Brief at 11-12. In light of the recommendation of the case manager and child advocate to terminate parental rights, as well as the ample evidence in the record regarding Mother's failure to remedy the conditions resulting in removal, we cannot say the trial court clearly erred in finding that termination of Mother's parental rights is in the Children's best interests.

[15] Finally, Mother contends that DCS's "egregious and chaotic handling of the case, including the arbitrary removal of service providers and unreasonable delays in referrals, deprived [her] of procedural due process." Appellant's Mother's Brief at 6.[8] This Court has previously concluded that "a parent may waive a due-process claim in a CHINS or termination proceeding by raising that claim for the first time on appeal." *S.L. v. Ind. Dep't of Child Servs.*, 997 N.E.2d 1114, 1120 (Ind. Ct. App. 2013) (citing *McBride v. Monroe Cnty. Off. of Fam. & Child.*, 798 N.E.2d 185, 194-195 (Ind. Ct. App. 2003)). Mother failed to

---

[8] We cannot say that the record supports Mother's characterization of DCS's handling of this case with respect to her.

raise a due process challenge at the fact-finding hearing and therefore, has waived this due process claim. As the State points out, there is a limited exception to waiver for claims of fundamental error; however, Mother does not argue fundamental error in her appellate briefing.

## B. *Father*

[16] Father raises many of the same issues as Mother; however, we find one of those issues dispositive. Father asserts that "[w]hen the State seeks to terminate parental rights, it must do so in a manner that meets the requirements of due process." Appellant Father's Brief at 25 (quoting *In re T.W.*, 135 N.E.3d 607, 613 (Ind. Ct. App. 2019), *trans. denied*). Unlike Mother, by all accounts, Father was compliant with and successfully participated in ordered services, held a job, consistently visited with the Children, and had a strong connection with the Children.[9] Father asserts, DCS essentially concedes, and the record supports, that the termination of his parental rights centered solely upon his housing situation and, at the time of termination, the only true barrier to Father's reunification with the Children was his lack of stable housing. Specifically, the trial court concluded:

> Despite reasonable efforts of DCS, [Father] has not been able to achieve stable housing. While the Court notes he has had supervised visits with the [C]hildren, the CHINS matter has been

---

[9] In its brief, the GAL states that it "responds only to Mother's argument that [its] investigation was flawed because the GAL was not in contact with Mother." Kids' Voice Appellee's Brief at 9.

pending since July of 2022.[10]  [Father] has not been able to obtain stable housing in 3.5 years, and thus the Court finds the housing situation is unlikely to be remedied.

Appellant Father's Appendix at 114.  Father argues that DCS failed to make reasonable efforts to address that barrier to reunification despite his own relentless efforts and requests for help and that "DCS's refusal to comply with its policy and practice to reunify the Children with [him] violated his Due Process Rights."  Appellant Father's Brief at 25.

[17]  First, despite DCS's urging, we decline to find that Father has waived his due process claim.  During the close of the termination hearing, Father's counsel specifically argued that DCS's "hard lined" approach to Father's failure to secure "traditional conventional housing" violates "the due process clause of the federal and state constitutions."  Transcript Volume II at 191-192.[11]  Father has preserved this claim and we address it on the merits.

[18]  The Indiana Supreme Court has emphasized that "termination of parental rights is the most extreme sanction a court can impose on a parent" and "is intended as a last resort, available only when all other reasonable efforts have failed."  *In re I.A.*, 934 N.E.2d 1127, 1136 (Ind. 2010) (reversing termination of

---

[10] We observe that the court did not enter a parental participation order as to Father until December 12, 2023.

[11] We observe that, in arguing that Father waived his due process claim on appeal, DCS patently misstates the record in claiming that '[n]either Mother nor Father even mentioned the phrase 'due process' in their closing arguments." Appellee DCS's Brief at 46.  As the above-quoted language makes clear, this assertion is false as to Father.

father's parental rights after determining "[w]e are not convinced that all other reasonable efforts have been employed in this case to unite this father and son"). Specifically, "for a parent's due process rights to be protected in the context of termination proceedings, DCS must have made reasonable efforts to preserve and/or reunify the family unit in the CHINS case[.]" *T.W.*, 135 N.E.3d at 615; *see also* Ind. Code § 31-34-21-5.5 (stating DCS is generally required to make reasonable efforts to preserve and reunify family during CHINS proceedings). But what constitutes "reasonable efforts" varies by case and the requirement that DCS make reasonable efforts to reunite a family "does not necessarily always mean that services must be provided to the parents." *T.W.*, 135 N.E.3d at 615. Moreover, the general requirement to make reasonable efforts to reunify families during CHINS proceedings is not an element of the termination statute, "and a failure to provide services does not serve as a basis on which to directly attack a termination order as contrary to law." *In re H.L.*, 915 N.E.2d 145, 148 n.3 (Ind. Ct. App. 2009). We recognize, however, that CHINS and termination proceedings are "deeply and obviously intertwined to the extent that an error in the former may flow into and infect the latter[.]" *In re G.P.*, 4 N.E.3d 1158, 1165 (Ind. 2014).

[19] In *T.W.*, we held that where the father consistently attempted to engage with DCS and participate in reunification services during the CHINS proceeding but DCS made no genuine effort to provide him with support and services, a risk of the erroneous filing of a termination petition was created by DCS's inaction and the father's due process rights were violated. 135 N.E.3d. at 618. In short, in

*T.W.*, DCS "wholly failed to make reasonable efforts to preserve" the parent-child relationship despite father's diligent and consistent efforts. *Id.*

[20] The record here reveals that, at the time of termination, Father had found an extended stay hotel that he could pay for on a weekly or monthly basis. DCS opined that such housing was too unstable, and the trial court agreed in finding that Father had "not achieved stable housing." Appellant Father's Appendix Volume II at 112. The court concluded that this was the case "[d]espite reasonable efforts of DCS" and that Father's "housing situation is unlikely to be remedied." *Id.* at 114. This is where we part ways with the trial court and find *T.W.* instructive as we are not convinced that the record supports a finding that reasonable efforts have been employed in this case to unite Father with his children and that there is, in fact, a reasonable probability that Father's housing situation can and will be remedied.

[21] The evidence indicates that Father, with the help of one of his service providers, submitted applications for at least fifty apartments all of which were rejected due to Father's criminal history.[12] Being that obtaining suitable housing was Father's only apparent obstacle to reunification,[13] this is exactly the time DCS

---

[12] Father's Engagement provider, Nando Poindexter, testified that it was his understanding that Father's ability to pay for housing was not "an issue," and that it was simply his criminal history that was causing the rejections. Transcript Volume II at 79.

[13] There was no testimony or evidence presented to indicate that DCS had any other concern regarding Father's ability to reunify with the Children. The trial court found that Father's "criminal history is a barrier to finding and maintaining stable housing, which is not likely to be remedied." Appellant Father's Appendix Volume II at 113. The housing issue was also used to support the court's finding that Father had "never progressed past supervised parenting time." *Id.* at 112. The evidence is clear that Father's failure to progress

efforts should have increased. *See, e.g.*, *T.W.*, 135 N.E.3d at 618 (noting that it "should have been no surprise" to the family case manager that the father, who had recently been released from incarceration, would, at times, "flounder" in his reunification efforts and observing that the father "should have been given more assistance in this situation—especially since he explicitly asked for it").

[22] At the time of termination, Father had been living in a house with his sister-in-law for quite some time in order to provide a stable home for the Children, but his sister-in-law "had some DCS history" which automatically disqualified her home as suitable. Transcript Volume II at 123-124. DCS admittedly has a "policy to seek a waiver if there's DCS history and a placement" to allow children to be possibly placed in such a home but, inexplicably, "no efforts" were taken to seek a waiver in this case. *Id.* Father had also previously identified another potential home where he could reside, but "a resident that was in the home was in the middle of a current legal situation" that also disqualified that home. *Id.* at 123.

[23] Just a week before the termination hearing, Father's significant efforts to find housing paid off as he found an apartment that would accept him despite his criminal history. Father testified that the lease required a $1,300 up-front payment, that he did not have the full amount, and that he asked FCM Phillips for help. FCM Phillips confirmed that, shortly before the termination hearing,

___

past supervised parenting time was due to his inability to obtain what DCS considered to be suitable housing and thus, these two findings are intertwined.

DCS learned that Father had made "progress" as "far as finding a potential apartment" but FCM Phillips simply "hadn't had a chance to [meet] with [his] supervisor regarding assistance for rent and deposit." *Id*. at 124.[14] Despite the fact that Father was clearly "on track to find traditional housing" that DCS would likely approve of, there is no indication in the record as to why this option could not have been explored further before the grave consequence of terminating Father's rights. *Id*. at 125.

[24] Finally, we find curious that DCS disapproved of Father's identified extended-stay hotel as being too unstable, while undisputedly finding a similar arrangement adequate for Mother to maintain placement of the Children at the outset of the CHINS proceedings. While we recognize that such nontraditional housing would not necessarily be a long-term solution for Father, such arrangement should not serve as the sole grounds for which DCS sought termination of Father's parental rights.

[25] Under the unique circumstances presented, we cannot say that the record demonstrates that DCS made reasonable efforts to reunify Father with his children so as to protect his right to due process in the termination proceedings. In light of the ample evidence that Father has consistently demonstrated his "dedication to the process of reunifying with his children," Transcript Volume II at 80, we conclude that DCS's actions (or inactions) regarding Father's

---

[14] Father states that DCS policy allows for "a one-time payment of up to $750 for a parent's rent and security deposit." Appellant Father's Brief at 16 (citing DCS Manual, Ch. 16, Sec. 3).

inability to secure approved housing, created "a risk of the erroneous filing of a petition to terminate." *T.W.*, 135 N.E.3d at 618.

[26] For the foregoing reasons, we affirm the trial court's termination of Mother's parental rights to all three of the Children. However, we reverse the trial court's termination of Father's parental rights as to K.R. and Te.R. and remand with instructions to reopen the CHINS case and re-examine the requirements for reunification.

[27] Affirmed in part, reversed in part, and remanded.

Bailey, J., and Weissmann, J., concur.

ATTORNEYS FOR APPELLANT K.W. (MOTHER)

Don R. Hostetler
Indianapolis, Indiana

Talisha Griffin
Marion County Public Defender Agency
Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLANT T.R. (FATHER)

Andrea Rahman
Andrea Rahman Law
Indianapolis, Indiana

Talisha Griffin
Marion County Public Defender Agency
Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE INDIANA DEPARTMENT OF CHILD SERVICES

Theodore E. Rokita
Attorney General of Indiana

Evan Matthew Comer
Supervising Deputy Attorney General
Indianapolis, Indiana


ATTORNEY FOR APPELLEE KIDS' VOICE OF INDIANA

Katherine Meger Kelsey
Chief Legal Counsel
Kids' Voice of Indiana
Indianapolis, Indiana